*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

        Plaintiff-Appellee,

v

ALONTE PERTON SMITH,

        Defendant-Appellant.

FOR PUBLICATION
February 18, 2021
9:00 a.m.

No. 346044
Saginaw Circuit Court
LC No. 17-044002-FC

Before: SWARTZLE, P.J., and GLEICHER and M. J. KELLY, JJ.

SWARTZLE, P.J.

Defendant shot the wrong person. Defendant and the intended victim were in rival Saginaw-area gangs, and the intended victim had recently made homophobic slurs against him in a Facebook Live video. As revenge, defendant shot the actual victim, a woman whom he mistook for the rival gang member. This was the prosecutor's theory in the criminal trial, and in support, the prosecutor relied on various Facebook posts and video. Yet, most of the statements in the Facebook posts were made by third parties who did not testify at trial, and all of the evidence came from Facebook pages of non-testifying third parties.

Although a close call, the trial court did not abuse its discretion in authenticating the Facebook evidence. Yet, the trial court did abuse its discretion in admitting several hearsay statements from that evidence. We conclude, however, that while the hearsay statements should not have been admitted, they were merely cumulative to other admissible, nonhearsay evidence. Finding no other error justifying reversal or a new trial, we affirm defendant's convictions, though we do reverse and remand on a sentencing issue.

## I. BACKGROUND

This case arises from a shooting that occurred in the early-morning hours of February 9, 2017. The victim was shot more than ten times while seated in the front-passenger seat of a vehicle in the driveway of her home. Although no eyewitness could identify the shooter, data from defendant's GPS tether showed that he was present at the scene when the shooting occurred. The prosecutor argued that defendant was a member of a gang and that he shot the victim after mistaking her for Amaris Kinnard, a rival-gang member with whom he had been feuding on

Facebook. The prosecutor introduced statements purportedly made by third parties on Facebook to prove that defendant went by the nickname "Brick Head," and introduced a video purportedly posted by Kinnard on Facebook Live to prove that she had disparaged Brick Head online, giving rise to defendant's motive to shoot her. Neither Kinnard nor any of the other third parties who made these statements was called as a witness. The focus on appeal is the admissibility and use of the Facebook evidence, though defendant does raise other, non-Facebook related claims that we address.

## A. THE SHOOTING

Late in the evening of February 8, 2017, Tamika Amos, Joy Matthews, and Dorothy Cooper were hanging out together. Sometime around midnight, the women decided to visit a convenience store to purchase alcohol. Matthews drove her vehicle to the store, with Amos in the front-passenger seat. Cooper accompanied the two women to the store, but traveled in a separate vehicle. Amos entered the store, and then returned to Matthews's vehicle. As the women left the store, Cooper led the way in her vehicle and Matthews followed in her vehicle, with Amos as her front-seat passenger.

As soon as she left the store, Matthews noticed that a white vehicle "zoomed up behind" her vehicle and followed closely behind her rear bumper. Matthews could not discern the make or model of the white vehicle, how many doors it had, or how many occupants were inside it. Matthews made two turns after leaving the store, and the white vehicle made the same two turns. While on South 24th Street, just as she crossed Cherry Street, Matthews noticed that the white vehicle was no longer behind her. Matthews pulled into the driveway of Amos's home, which was close to Cherry Street. She placed the vehicle in park, turned off the headlights, and sat talking to Amos for several minutes.

In addition to Matthews's observations, both Amos and Cooper also noticed that a white vehicle had followed Matthews's vehicle after they left the store. Amos testified that when Matthews pulled her vehicle into the driveway of her home, the white vehicle pulled into a nearby driveway and turned off its headlights. Cooper was not able to see how many occupants were in the white vehicle, but she saw it pull into a driveway. None of the three women noticed a person getting out of the white vehicle after it parked.

Matthews testified that she and Amos sat in her vehicle, talking for several minutes. Then gunshots rang out. One of her vehicle's windows was shot out, and steady shots kept coming at the passenger door of the vehicle. Amos indicated that she had been shot, and Matthews attempted to flee by driving around the house to the backyard, where she struck a tree. Meanwhile, Amos testified that she was seated in the front-passenger seat of Matthews's vehicle, with her window up. She saw a dark figure standing a few feet away in her neighbor's yard, and she saw the flash of a firearm. Because it was dark, she could not identify the race of the shooter. Amos was shot more than 10 times, though she survived the attack.

Neither Matthews, Amos, nor Cooper could identify defendant as the shooter, and none of them knew defendant. There was no testimony that any of the women were members of a gang or that defendant had a gang-related motivation to shoot any of them. Furthermore, both Matthews and Amos denied that they had any enemies or problems with anybody at the time of the shooting.

-2-

## B. THE POLICE INVESTIGATION

### 1. THE SCENE OF THE SHOOTING

Buena Vista Township Police Department Officer Anthony Teneyuque was dispatched to the scene of the shooting at approximately 12:32 a.m. He observed that Amos was "writhing in pain" and that she had bullet holes in her legs, as well as significant injuries to her right hand. Amos told him that she and Matthews had been sitting in the vehicle when somebody started shooting. Officer Teneyuque observed numerous bullet holes in the passenger door of the vehicle. Officer Teneyuque spoke with Matthews, who told him that she and Amos had been at a local convenience store, and although they had not encountered any problems with anyone at the store, they had noticed a white vehicle follow them home.

After speaking with Amos and Matthews, Officer Teneyuque searched the driveway and front yard, where he found broken glass from the vehicle's shattered window. He found spent shell casings that had been discharged from a handgun, located approximately 10 to 15 feet from the spot where Matthews's vehicle had been parked. He found the shell casings in a grassy area containing a fence post, near the driveway of the neighbor's house. Another police officer collected 14 spent shell casings that had been fired from a 40-caliber handgun. Officer Teneyuque estimated that the shooter was standing within five feet from the location of the shell casings when the shooter fired the handgun at Amos. No handgun was ever recovered, and the prosecutor presented no evidence that defendant was found in possession of a 40-caliber handgun.

### 2. TETHER EVIDENCE

Three witnesses testified that data from defendant's GPS tether placed him at the scene of the shooting when it occurred. Several witnesses also provided circumstantial evidence that defendant covered his GPS-tether unit with tinfoil on the night of the shooting in a partially successful attempt to block the unit's signal from connecting with GPS satellites. The prosecutor presented this evidence for two purposes: to prove that defendant was present at the scene of the shooting when it occurred, and to prove that defendant committed the criminal offense of tampering with an electronic-monitoring device.

Gary Lutkus, a parole agent for the Michigan Department of Corrections (MDOC), testified that defendant was on parole on February 8-9, 2017, that he served as defendant's parole officer, and that defendant was monitored by a GPS tether at that time. Agent Lutkus testified that defendant had been "on and off" a GPS tether at different periods in time because defendant "went to jail on a violation," and that defendant was placed back on a GPS tether "after serving a jail sentence." The trial court promptly instructed the jury to "ignore and disregard" Agent Lutkus's testimony that defendant had been incarcerated, and instructed the jury that "when [defendant] was on the tether device is the only relevant information you are to consider."

Walter Wysopal, also a parole agent for the MDOC, testified that he regularly operated a software program to monitor GPS-tether units worn by parolees. After he learned about the shooting in this case, he searched that software program for the address where the shooting occurred. According to Agent Wysopal, the software program indicated that defendant's GPS-tether unit was present at the scene of the shooting. Agent Lutkus explained that, because

defendant was not permitted to leave his residence at night, defendant violated the conditions of his tether by being present at Amos's home on the night of the shooting.

Jessica Reuschel, another agent with the MDOC, testified that she worked in that agency's electronic-monitoring center, where she specialized in monitoring individuals under MDOC jurisdiction who were wearing a tether. The trial court qualified Agent Reuschel as an expert regarding the electronic-monitoring maps and systems associated with the tracking of GPS tethers. She testified about a map that was displayed to the jury, showing the location of defendant's tether at various points in time on February 8-9, 2017. She further testified that the tether was still attached to defendant at that time because the computer system had never generated an alert for a broken strap.

Agent Reuschel explained that, at 10:00 p.m. on February 8, the tether was located at defendant's home and it was stationary. At 11:46 p.m., defendant's tether remained at his home and it was stationary. But at 12:01 a.m. on February 9, the GPS satellites lost communication with defendant's tether. Agent Reuschel explained that this loss of signal could have occurred because something interfered with the transmission between the tether and the GPS satellites. Defendant's tether next registered with the satellites at 12:28 a.m. and 15 seconds, and the tether was then located off Cherry Street between South 23rd and 24th Streets, moving at a speed of six miles per hour. At 12:28 a.m. and 45 seconds, the tether stopped moving. Then at 12:29 a.m., the tether began moving away from Amos's home at a speed of nine miles per hour. (As stated earlier, the police were dispatched to the scene at 12:32 a.m.) According to Agent Reuschel, the GPS signal showed that the tether reappeared at defendant's home a few moments later. Andrew Menichino also testified as an expert in GPS-tether devices. Menichino testified that he accessed his company's GPS records to determine defendant's whereabouts between midnight and 12:30 a.m. on the night of the shooting. His testimony closely tracked that of Agent Reuschel.

Agent Lutkus and another parole officer, Agent Thomas McNeil, visited defendant's home on February 13, 2017, after learning that defendant had violated the restrictions of his tether on the night of the shooting. Defendant was not home at the time, but the agents received permission to search the home. Agent Lutkus found an empty box that had contained tinfoil in defendant's basement bedroom, while Agent McNeil found three or four balls of tinfoil in a trash can on the front porch. According to Agent McNeil, it is common for individuals on GPS tethers to cover their units with tinfoil to prevent a signal from transmitting. Agent McNeil testified that the tinfoil in the trash can measured "just big enough to cover our GPS units," but not large enough to have contained food, and it was free of any food residue.

3. THE SUSPECT VEHICLE

Detective Sergeant Greg Klecker testified that he obtained the surveillance video from the store that Amos, Matthews, and Cooper visited on the night of the shooting. The store owner authenticated the video, which was admitted into evidence without objection.

The video showed Amos enter and then exit the store. The video also showed a white vehicle approach from the west. The vehicle appeared to wait for Amos to exit the store, and then followed Matthews's vehicle. Detective Sergeant Klecker captured still images of the suspect

vehicle from the video, and he testified that the vehicle matched the description that Matthews, Amos, and Cooper had given of the white vehicle that had followed them home from the store.

Detective Sergeant Klecker further testified that, several months later, he located a white vehicle in the driveway of defendant's residence. He believed that the vehicle had "striking similarities" to the vehicle shown in the store's surveillance video. The trial court admitted into evidence photographs that Detective Sergeant Klecker took of the white vehicle at defendant's residence.

## 4. FACEBOOK EVIDENCE

On the third day of trial, the prosecutor sought to introduce into evidence some Facebook posts to establish that defendant was affiliated with a gang and that he had a gang-related motive to commit the shooting. The prosecutor argued that the proposed evidence was critical to show that defendant went by the nickname Brick Head and to establish a link between the shooting and a video posted to Facebook by Kinnard, to support the theory that the shooting was gang-related. The prosecutor further argued that the evidence was admissible based on the anticipated testimony of Agent Wysopal, who was "an embedded agent that researches these gang members," and who had obtained statements and photographs from the Facebook pages of various third parties.

Defense counsel objected to the proposed evidence, and the trial court heard argument regarding its admissibility outside the presence of the jury. Although defense counsel did not use the words "authentication" or "hearsay," it is clear from the record that counsel's objections were based, in part, on those grounds. Defense counsel argued, for example, that the Facebook evidence was "not admissible because they're statements by other people," and there was no way to determine whether these people were "reliable." Defense counsel also argued that admitting the comments from the posts in which defendant was referred to as Brick Head would not be "appropriate" because the comments "are from other people who are writing . . . about what is in the photo. Whether they know it's true or not, whoever they are or whatever they are, they're writing comments about something they have seen" but they would not be appearing as witnesses. Counsel rhetorically asked, "How are these admissible? Who's going to tie them in?" In response, the prosecutor reiterated that the evidence would be used to show defendant's identity as Brick Head, as well as his gang affiliation. He offered that Agent Wysopal could authenticate the exhibits.

The trial court examined case law involving gang-related evidence, authentication, and hearsay. After briefly discussing our Supreme Court's opinion in *People v Bynum*, 496 Mich 610; 852 NW2d 570 (2014), the trial court explained that gang-related evidence could be admissible if it went to a relevant issue, such as motive. The trial court recognized that the prosecutor wanted to use the evidence to establish defendant's pseudonym and gang membership, both of which went to motive. The trial court made clear that, if the evidence was admitted, it could only be used by the prosecutor for a proper purpose, rather than to show that defendant acted in conformity with being a gang member. As for authentication and hearsay, the trial court noted concerns about hacking and fake accounts and indicated that defense counsel's arguments were well-taken, but concluded that the arguments in this case went to weight, not admissibility. The trial court reserved a final ruling until the evidence was offered and any additional objections were made.

When Agent Wysopal began to testify regarding statements and photographs that he had discovered on Facebook, defense counsel renewed his earlier objections. The trial court ruled, "All right. Based on the record that we created earlier, I'm going to allow the questioning at this time." The trial court then clarified that the Facebook evidence was "admitted for the purposes that we discussed earlier . . . and no other purposes at this time."

The trial court qualified Agent Wysopal as an expert regarding street gangs in the Saginaw area. Agent Wysopal testified that he knew defendant "for quite some time since he's been out on parole," and defendant was affiliated with the East Side Gang. As for the street name Brick Head, Agent Wysopal explained that he had known defendant by that name "for quite some time," and no one else went by that name. Agent Wysopal was familiar with Kinnard, and he knew her to be a member of a gang called the Townhouse Bloomfield Family. The agent testified that the East Side Gang and the Townhouse Bloomfield Family were rival gangs, that the location of the shooting was in the latter gang's territory, and that the location was not a safe place for a member of the East Side Gang.

Agent Wysopal explained that he searched defendant's Facebook page as well as the Facebook pages of various individuals with whom he believed defendant to be associated. The prosecutor did not offer into evidence any photographs or statements posted to defendant's own Facebook page. The prosecutor did, however, offer into evidence four exhibits that Agent Wysopal had printed from the Facebook pages of third parties:

- Exhibit 11A purported to be a print-out of a Facebook post from the page of a person named "Frederick Sutton." Neither side called Sutton to testify. The exhibit included a photograph of a male and female with the nickname "BRICKHEAD" superimposed on the photograph. Agent Wysopal identified the male as defendant. There was a single comment above the photograph— "Y'all know we going to dumb free my boy B." There were several comments below the photograph, but these comments were redacted, so the jury never saw them. The post is dated June 30 of what appears to be 2017.

- Exhibit 11B purported to be a print-out of a Facebook post from the page of a person named "JayyMann Green." Neither side called Green to testify. The exhibit contained a photograph of defendant with other individuals whom Agent Wysopal identified as members of the East Side Gang. Several of the individuals appear to making "gun signs" with their hands, as the agent noted. The only comment shown to the jury was immediately above the photograph— "It Ain't Blood If Don't Bleed Ya Understand Me 🔴🔴🔴 NTD." The post is dated December 3, 2016.

- Exhibit 11C purported to be a print-out of a Facebook post from the page of a person named "Shaq B Laflair." Neither side called Laflair to testify. The exhibit contained a photograph of defendant with an unidentified third party. The only comment shown to the jury was immediately above the photograph— "ME & Brick Lontae Smith BOOLIN." The post is dated November 20, 2016.

- Exhibit 11E purported to be a print-out of a Facebook post from the page of a person named "Uniqua Wicker." Neither side called Wicker to testify. The exhibit contained a photograph of defendant with several other individuals. Agent Wysopal testified that defendant was using his hands to display the symbol of the East Side Gang. There were multiple comments posted on the page, but all were redacted except one. The jury saw the following comment by a person identified as "Darius Steele"—"Happy birthday to my baby brickhead." Agent Wysopal acknowledged that the comment was dated July 9, 2012.

Agent Wysopal confirmed that the four exhibits were accurate copies of the Facebook posts that he viewed when investigating defendant's potential involvement in the shooting. After a brief voir dire by defense counsel, the trial court admitted the exhibits for the purposes it had earlier discussed with counsel.

The prosecutor then offered into evidence a Facebook Live video purportedly posted by Kinnard. Agent Wysopal testified that he viewed Kinnard's Facebook page in the course of a separate investigation not involving defendant, during which he stumbled across the video that had been posted by Kinnard on January 21, 2017. Agent Wysopal explained that Kinnard was "disrespecting" defendant in the video. Over defense counsel's objection, the trial court admitted the video into evidence. Although the trial transcript does not contain a verbatim transcript of the video or the portions of the video played for the jury, the prosecutor summarized the contents of the video for the trial court—when the jury was out of the courtroom—as follows:

> Amaris Kinnard is a—testimony will show that she's a Townhouse Bloomfield Family Gang member. She—in this video that she posted on January 21st of 2017, a couple weeks before the shooting, she's calling Mr. Alonte Smith, who's shown to be an east-sider in these Facebook posts, saying that—alleging him of his sexual preferences, calling him a gay thug, a gay gangbanger, saying that she's not taking this video down until he takes the photo down of her. We were unable to locate that photo, but this video is taking place in realtime and there's several people following it.

> She indicates—she—one of the followers, Brick Head, who is linked as Alonte Smith through these Facebook posts, he types, you know, me on this number, all's you are doing is you talk about me, and finally, at some point, he says TBF, which testimony will show stands for Townhouse Bloomfield Family, dash, OMW, on my way, indicating that he's on her [sic] way to straighten this out is what the prosecution's theory is.

> Now, these—this is instrumental because we believe that this is a motive for the shooting and this is gang-related, and TBF, indicating on my way and her calling him, calling Mr. Smith, the defendant, a gay gangbanger, [he] has no credibility and he's a gay thug, and she goes on for 21 minutes calling him out, so we believe this is gang-related.

Although listed on the prosecution's witness list, the prosecutor did not call Kinnard as a witness to authenticate the video. The video presented the only evidence that Kinnard had engaged in a dispute with defendant or that she had disparaged him online.

The prosecutor did not play the entire video (which is nearly 24 minutes in duration), but instead only played a few clips for the jury. The transcript indicates each of the points in time that the video was played. The prosecutor explained to the trial court that some portions of the video contained "prejudicial information that's not pertinent" to the trial. A subsequent exchange outside of the jury's presence at the close of proofs indicated that Kinnard's video referenced the fact that defendant had previously spent time in prison.

In addition to the video itself, several comments were made alongside the video. Agent Wysopal specifically testified that one of the comments was by Brick Head, who posted a comment during the live video, stating "TBF, OMW." According to Agent Wysopal, that meant "Townhouse Bloomfield Family, on my way." In addition, Agent Wysopal testified that Brick Head posted another comment, stating, "I got little niggas."

To support the theory that defendant had intended to shoot Kinnard, but had shot Amos by mistake, the prosecutor then presented Detective Sergeant Klecker's testimony that he had obtained photographs of both Kinnard and Amos through the LEIN system. The trial court admitted both photographs into evidence. According to Detective Sergeant Klecker, there was a "striking similarity" between the two women in terms of "complexion, hair, and height," except that one woman was four inches taller than the other. In addition to the photographs, the jury was able to observe Amos when she testified and Kinnard in her video.

## C. VERDICT AND SENTENCE

After the close of proofs, the prosecutor and defense counsel made closing statements. The prosecutor made a point of directing the jury's attention to the video from the convenience store that showed the white vehicle that followed Amos and her friends. The prosecutor described a third brake light in the middle of the vehicle's rear-end, and asked the jury to compare that to the picture of the white vehicle found at defendant's residence. Defense counsel objected to how the prosecutor was using the video to make the point rather than still photographs, but the trial court overruled the objection. After the prosecutor summarized the remaining evidence and the prosecution's theory, defense counsel offered his closing. He argued that the prosecution's theory had evidentiary weaknesses, including the lack of certain key witnesses or motive. Defense counsel maintained that there was insufficient evidence to identify defendant as the shooter beyond a reasonable doubt. The prosecutor offered brief rebuttal, and then the trial court instructed the jury. When asked by the trial court if there were any objections to the instructions, defense counsel responded, "None on behalf of the defense."

The jury convicted defendant of one count of assault with intent to murder (AWIM), MCL 750.83; two counts of possession of a firearm during the commission of a felony, second offense (felony-firearm), MCL 750.227b; one count of felon in possession of a firearm, MCL 750.224f; and one count of tampering with an electronic-monitoring device, MCL 771.3f.

The trial court sentenced defendant, as a fourth-offense habitual offender, MCL 769.12, to a term of 40 to 50 years in prison for the AWIM conviction, 5 years in prison for each of the felony-firearm convictions, 4 to 20 years in prison for the felon-in-possession conviction, and 2 to 15 years in prison for the conviction of tampering with an electronic-monitoring device. At a subsequent hearing, the trial court stated that it had erred by sentencing defendant to a term of 40 to 50 years in prison for the AWIM conviction because the minimum sentence was more than two-thirds of the maximum sentence for that conviction and therefore violated MCL 769.34(2)(b). In accord with this explanation, the trial court resentenced defendant, without objection, to a term of 40 to 62 years in prison for the AWIM conviction, leaving defendant's other sentences unchanged.

## D. APPEAL

Defendant appealed as of right from his convictions and sentences, with the exception of tampering with an electronic-monitoring device. While this appeal was pending, defendant moved for a remand for an evidentiary hearing. In support of the motion and appeal, defendant swore in an affidavit that he approached his defense counsel at trial with, among other things, the following concerns:

- he asked defense counsel to request a mere-presence jury instruction;

- he asked defense counsel to ask Amos if she knew defendant, "because her father-in-law is [defendant's] best friend";

- he asked defense counsel to point out to the jury that "the white car in the video had a third brake light, while [defendant's] father's Impala SS does not"; and

- he asked defense counsel to call Kinnard as a witness to establish that she and defendant went to high school together, and they "play with each other on Facebook to see who gets the most views."

Defendant did not provide an affidavit from either Amos or Kinnard in support of his motion. The motion for remand was denied. *People v Smith*, unpublished order of the Court of Appeals, entered July 29, 2019 (Docket No. 346044).

After oral argument, this Court ordered the prosecutor to file a brief and provide this Court with the video, photographic, and documentary exhibits offered at trial. Having received and reviewed the exhibits, the appeal is now ready for resolution.

## II. ANALYSIS

On appeal, defendant first claims that the trial court erred as a matter of law when it resentenced him to a higher maximum sentence, and the prosecutor now concedes that this was error. The Court agrees with the parties that defendant's sentence for AWIM is not subject to the 2/3-rule of MCL 769.34(2)(b) and, as a result, defendant is entitled to have his original sentence reimposed on remand. *People v Floyd*, 490 Mich 901, 902; 804 NW2d 564 (2011).

Defendant next claims that he was denied the ineffective assistance of trial counsel and that the trial court made several reversible evidentiary errors. As explained below, these latter claims

are without merit. (Given our holding with regard to resentencing, we decline to reach defendant's related claim that his defense counsel was ineffective for not objecting at resentencing.)

## A. INEFFECTIVE ASSISTANCE OF COUNSEL

Defendant's right to counsel is guaranteed by the United States and Michigan Constitutions. US Const, Am VI; Const 1963, art 1, § 20. This right includes the right to the effective assistance of counsel. *People v Cline*, 276 Mich App 634, 637; 741 NW2d 563 (2007). "Whether a defendant has been denied the effective assistance of counsel is a mixed question of fact and constitutional law." *People v Solloway*, 316 Mich App 174, 187; 891 NW2d 255 (2016). Defendant moved earlier to remand this matter for an evidentiary hearing alleging, among other things, that trial counsel was ineffective. This Court denied the motion, so we review defendant's ineffective assistance of counsel claims for errors apparent on the record, though we retain the authority to remand for an evidentiary hearing if one is needed. See *People v Horn*, 279 Mich App 31, 38; 755 NW2d 212 (2008).

To establish a claim of ineffective assistance of counsel, defendant must show that: (1) defense counsel's performance was deficient; and (2) the deficient performance prejudiced the defense. *People v Taylor*, 275 Mich App 177, 186; 737 NW2d 790 (2007). Defense counsel's performance is deficient if it fell below an objective standard of professional reasonableness. *People v Jordan*, 275 Mich App 659, 667; 739 NW2d 706 (2007). Defendant bears a heavy burden to show that counsel made errors so serious that counsel was not performing as guaranteed by the Sixth Amendment, and defendant must overcome a strong presumption that counsel's performance constituted sound trial strategy. *People v Carbin*, 463 Mich 590, 599-600; 623 NW2d 884 (2001), citing *Strickland v Washington*, 466 US 668; 104 S Ct 2052; 80 L Ed 2d 674 (1984); *People v Rockey*, 237 Mich App 74, 76-77; 601 NW2d 887 (1999). The performance will be deemed to have prejudiced the defense if it is reasonably probable that, but for counsel's error, the result of the proceeding would have been different. *Jordan*, 275 Mich App at 667.

## 1. INEFFECTIVE ASSISTANCE OF COUNSEL—WITNESSES

Defendant's first ineffective assistance of counsel claim involves the testimony of Amos, Detective Sergeant Klecker, and Kinnard. With respect to Amos, defendant asserts that he knows her, though he concedes on appeal that it is "through a tenuous relationship." If defense counsel had asked her about their acquaintance, her response would have gone against the prosecutor's theory that he mistook her for Kinnard.

Even assuming for the sake of argument that defendant had a relationship with Amos, we agree that it is, indeed, a tenuous one. Given the physical similarities between the two women, the fact that the shooting took place around midnight, and Matthews's testimony that the lights on her vehicle were off, defendant could have easily mistaken the two women, even assuming defendant knew (somewhat) Amos. Defense counsel could have decided to avoid this topic so as not to reiterate the circumstances suggesting mistaken identity, or to avoid the risk that Amos would deny the existence of this tenuous relationship. Trial strategy is left to the sound judgment of trial counsel. *Rockey*, 237 Mich App at 76-77.

With respect to Detective Sergeant Klecker, defendant argues that defense counsel should have asked him whether the vehicle in the surveillance video had a third brake light. Defendant notes that during closing argument, the prosecutor referenced the "third brake light" on the vehicle in the surveillance video and noted that it was similar to the light on the vehicle found at defendant's residence. Defendant has not, however, shown that he was prejudiced by the lack of a question, given that photographs of both vehicles were introduced into evidence and available for the jury to review.

Defendant further faults defense counsel for failing to call Kinnard as a witness. He notes that she was listed as a witness by the prosecutor, who decided not to call her. In his affidavit, defendant asserts that he and Kinnard attended high school together and that they "play with each other on Facebook to see who gets the most views." Defendant claims that he asked his lawyer to call Kinnard as a defense witness to show that they were not enemies, contrary to the prosecutor's theory. Defendant did not, however, provide an affidavit from Kinnard with his motion to remand to support his assertions regarding their relationship, nor has he pointed to any evidence in the record that demonstrates he and Kinnard had a friendly (or, at the very least, benign) relationship. Moreover, defense counsel may have hoped that the lack of in-person testimony would undercut the prosecutor's attempt to show that Kinnard and Amos resembled each other. Based on this record, defendant has not overcome the presumption that trial counsel's decision not to call Kinnard as a witness was sound trial strategy. *Carbin*, 463 Mich at 599-600.

## 2. INEFFECTIVE ASSISTANCE OF COUNSEL—FACEBOOK EVIDENCE

Next, defendant claims that defense counsel provided ineffective assistance by failing to object to the admission of Facebook evidence on grounds of hearsay. Defendant acknowledges that trial counsel objected to this evidence, but faults him for failing to do so on hearsay grounds.

This claim is without merit because, although trial counsel did not say the word "hearsay" or cite to the relevant court rule, he did argue that the Facebook evidence was "not admissible because they're statements by other people," and there was no way to determine whether these people were "reliable." The trial court understood defense counsel to have raised a hearsay objection, and the trial court cited the hearsay rule during its discussion of the evidence. Thus, while the hearsay objection could have been more explicit, the sum and substance of trial counsel's objection included that ground.

## 3. INEFFECTIVE ASSISTANCE OF COUNSEL—JURY INSTRUCTIONS

Moving to the jury instructions, defendant faults trial counsel for failing to request an instruction for assault with intent to do great bodily harm as a lesser included offense of AWIM. He also claims that his trial counsel should have requested a mere-presence jury instruction. Both arguments fail.

Considering the lesser-included instruction first, "a trial court, upon request, should instruct the jury regarding any necessarily included lesser offense . . . if the charged greater offense requires the jury to find a disputed factual element that is not part of the lesser included offense, and a rational view of the evidence would support it." *People v Silver*, 466 Mich 386, 388; 646

NW2d 150 (2002). In this case, a rational view of the evidence did not support a finding that the shooter did not intend to murder the intended target.

To convict a defendant of assault with intent to murder, the jury must find that the defendant had the intent to murder the victim. MCL 750.83. To convict a defendant of assault with intent to do great bodily harm, the jury would have to conclude that the defendant did not intend to murder the victim, but did intend to cause great bodily harm. MCL 750.84. The evidence showed that the window of Matthews's vehicle was shot out, the passenger door had multiple bullet holes, and Amos was shot more than 10 times. Although Amos did not sustain life-threatening injuries, there was no evidence that the shooter did not intend to kill the occupants of the vehicle, especially in light of the number of shots fired and the location of the shots, which were clearly aimed at the passenger. Thus, defendant has not established that he was entitled to a lesser included offense instruction because the instruction was not supported by a rational view of the evidence.

Further, defendant's theory of the case was that he was not the shooter, not that he lacked the intent to murder. Defense counsel might have decided not to request a lesser included offense instruction to emphasize that defendant did not, in fact, commit the offense, regardless of intent. As the evidence was largely circumstantial, this was a reasonable trial strategy, and defendant has not shown that defense counsel was ineffective for this reason. See *Carbin*, 463 Mich at 599-600.

With respect to the mere-presence jury instruction, the model instruction provides as follows: "Even if the defendant knew that the alleged crime was planned or was being committed, the mere fact that [he / she] was present when it was committed is not enough to prove that [he / she] assisted in committing it." M Crim JI 8.5. Defendant points out that no witness positively identified him as the shooter, and the instruction would "seem" to have "assisted the defense, once the GPS evidence was introduced."

Yet, it is unclear how this instruction would have aided defendant at trial. He has not argued, nor is there anything in the record to suggest, that he had a valid reason to be in the area when the shooting took place. In fact, as conditions of his parole, defendant was on a GPS tether and was not permitted to go anywhere at night. Nor has defendant argued that he was present or witnessed the shooting; again, his defense was one of mistaken identity, not mere presence. Thus, there is nothing in the record showing that defendant's trial counsel was ineffective for not asking for the mere-presence instruction.

## B. EVIDENTIARY CLAIMS

Moving from the ineffective assistance of counsel claims to the evidentiary ones, defendant raises claims based on authentication, hearsay, and gang-related propensity evidence. He does not, however, make a claim on appeal related to any reference—express or veiled—regarding his prior criminal record voiced during trial.

This Court reviews a trial court's decision to admit or deny evidence for an abuse of discretion. *People v Layher*, 464 Mich 756, 761; 631 NW2d 281 (2001). We review de novo preliminary questions of law, such as whether a rule of evidence or statute precludes the admission of particular evidence, and it is an abuse of discretion to admit evidence that is inadmissible as a

matter of law. *Bynum*, 496 Mich at 623. Yet, a trial court's decision on a close evidentiary question cannot, by definition, qualify as an abuse of discretion. *Layher*, 464 Mich at 761.

## 1. AUTHENTICATION OF FACEBOOK EVIDENCE

Defendant initially challenges the authentication of the four "still" Facebook posts, i.e., Exhibits 11A, 11B, 11C, and 11E. Defendant stresses that the Facebook posts were alleged to have come from others' accounts, not his own account. None of the purported account owners testified, and defendant argues that Agent Wysopal merely testified that the posts pertained to defendant, which was insufficient to authenticate them under MRE 901.

Authentication of an evidentiary exhibit is a two-stage process. First, under MRE 901(a), the proponent of the exhibit has the burden to present "evidence sufficient to support a finding that the matter in question is what its proponent claims." At the first stage, the trial court must determine whether the proponent of the evidence has made "a prima facie showing that a reasonable juror might conclude that the proffered evidence is what the proponent claims it to be." *Mitchell v Kalamazoo Anesthesiology, PC*, 321 Mich App 144, 155; 908 NW2d 319 (2017) (citation omitted). This stage is reserved exclusively for the trial court, though it is not a particularly "exacting" standard. 31 Wright and Gold, Federal Practice and Procedure: Evidence (2000), § 7104, p 36. As one commentator explained with regard to the federal counterpart to MRE 901(a), "The judge should permit the evidence to go to the jury unless the showing as to authenticity is so weak that no reasonable juror could consider the evidence to be what its proponent claims it to be." *Id.*; see also *id.* § 7102, p 15 (describing the first condition as "a minimal showing").

If the first condition is satisfied, then "the evidence is authenticated under MRE 901(a) and may be submitted to the jury." *Mitchell*, 321 Mich App at 155 (citation omitted). At this second stage, the jury remains the ultimate fact-finder, and the jury decides whether the evidence is reliable and what weight to give the evidence, if any. *Id.* at 156. "When a bona fide dispute regarding the genuineness of evidence is presented, that issue is for the jury, not the trial court." *Id.* (citation omitted). "In other words, conflicting evidence on genuineness goes to weight, not admissibility, so long as some reasonable person could believe that the item is what it is claimed to be." *Id.* (cleaned up).

On appeal, our review is limited to the first stage. If there was no abuse of discretion by the trial court in authenticating the evidence under MRE 901(a), then it was left to the jury as fact-finder to determine the reliability and weight of the Facebook posts. And yet, while the showing at the first stage is not a particularly rigorous one, we are mindful that in the age of fake social-media accounts, hacked accounts, and so-called deep fakes, a trial court faced with the question whether a social-media account is authentic must itself be mindful of these concerns. In this case, the trial court considered several unpublished decisions of this Court to glean guidance on how Facebook pages should be analyzed. The trial court noted concerns with fake social-media accounts, and it also recognized that the case law it reviewed involved posts purportedly made by the defendant, unlike the present case where all four posts were from other persons who did not testify. The trial court concluded, however, that the reasoning in those cases could be extended to this case, and the court conditionally authenticated the posts subject to any further objection that defense counsel might have when the prosecutor moved for admission of the posts.

It is important to recognize that the prosecutor did not use the posts solely as photographic evidence to identify defendant. When used as photographic evidence, there is little to distinguish the analysis of a photograph taken from a newspaper or other traditional source from one taken from a social-media account for purposes of MRE 901(a). See *United States v Farrad*, 895 F3d 859, 876-878 (CA 6, 2018) (applying traditional analysis for authenticating photographic evidence to photograph taken from Facebook page under FRE 901(a)); *United States v Thomas*, 701 F Appx 414, 419-420 (CA 6, 2017) (same). Regardless of source, a picture can be authenticated, for example, by considering the "[a]ppearance, contents, substance, internal patterns, or other distinctive characteristics" under MRE 901(b)(4).

But here, the key point that the prosecutor teased from the exhibits was that defendant (pictured) was known by the nickname Brick Head (written by someone next to the picture). While one picture was used to show that defendant was affiliated with the East Side Gang (Exhibit 11B, discussed separately in the next section), the main purpose of the posts was to affiliate defendant with the nickname. There was, in other words, more to the Facebook exhibits than just photographic evidence. Merely considering the distinctive features of the photographs alone would not have been sufficient to authenticate the social-media posts for the purpose of linking the person with the name.

Another way to authenticate evidence is through "[t]estimony that a matter is what it is claimed to be." MRE 901(b)(1). Here, Agent Wysopal was qualified as an expert in Saginaw street gangs. He testified that he went to defendant's Facebook page and then went to the Facebook pages of defendant's affiliates with the East Side Gang. The agent testified that the four exhibits accurately depicted the Facebook posts that he viewed when investigating defendant's potential involvement in the shooting. He was familiar with defendant, identified him in the photographs, and noted that defendant flashed a gang symbol with his hands in one of the photographs. On cross examination, Agent Wysopal acknowledged that one of the posts was dated more than five years before the shooting, and he noted that the posts were not from defendant's Facebook page.

Although a close call, we conclude that the trial court did not abuse its discretion by authenticating the four Facebook posts. The testimony of Agent Wysopal established that the exhibits were accurate depictions of what he claimed they were—four Facebook posts that he viewed when investigating defendant's possible connection with the shooting. Agent Wysopal had personal knowledge of defendant and defendant's affiliates, including those who were pictured in the posts. Importantly, Agent Wysopal had known defendant as Brick Head for "quite some time," which reinforced the authenticity of the posts that likewise connected defendant with that nickname. Moreover, there is nothing on the face of the posts that would suggest that they were faked or hacked so as to undermine the prima facie case for admission. It was not an abuse of discretion, therefore, for the trial court to conclude that a reasonable juror might conclude that the four exhibits were what the prosecutor and Agent Wysopal claimed they were—the Facebook pages that the agent viewed, printed, and believed were associated with defendant's affiliates.

Our conclusion does not discount the possibility that evidence from social media might, in fact, be inaccurate, hacked, or faked. As technology advances, trial courts and lawyers will need to be vigilant when considering questions of authenticity, at both the first and second stages. But as explained, it was not an abuse of discretion to conclude that the prosecutor had made the necessary prima facie case for admission of the four Facebook posts, and therefore it was proper

to leave questions about the reliability and weight of these exhibits in the collective hands of the jury.

## 2. HEARSAY IN FACEBOOK EVIDENCE

Although the four Facebook posts pass the test of authenticity on appeal, they (mostly) fail the test of hearsay. Hearsay "is a statement, other than the one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." MRE 801(c). "Evidence that is properly authenticated may nonetheless be inadmissible hearsay if it contains out-of-court statements, written or oral, that are offered for the truth of the matter asserted and do not fall under any exception" to the hearsay rule. *United States v Browne*, 834 F3d 403, 415 (CA 3, 2016); see also MRE 802.

The statement of a party-opponent offered against that party at trial is defined to be not hearsay. MRE 801(d)(2). With respect to Exhibits 11A, 11C, and 11E, the Facebook posts had comments made by persons who were not a party and who did not testify. Thus, this was *not* a circumstance where Facebook comments of defendant were introduced against him (unlike with Exhibit 11B and the Facebook video, as explained below), so MRE 801(d)(2) is inapplicable. The pertinent part of each comment— "BRICKHEAD", "Brick Lontae Smith", and "brickhead"—was written by a third party and superimposed on the photograph of defendant or set closely adjacent to the photograph of him. The clear inference to be made from each exhibit was that defendant was known by his associates as Brick Head. Thus, these comments, coupled with the photographs, were offered by the prosecutor to establish the truth of the matter asserted, i.e., that defendant was called Brick Head. There was no exception to the hearsay rule applicable to the comments, and thus the trial court abused its discretion by admitting the comments into evidence. *Bynum*, 496 Mich at 623; *Layher*, 464 Mich at 761.

Exhibit 11B differed from the other three exhibits in that the name Brick Head or its variant was not shown to the jury. (There is a comment referring to "brick," but that and other comments were redacted from the version shown to the jury.) The written statement in Exhibit 11B—"It Ain't Blood If Don't Bleed Ya Understand Me ⬚⬚⬚ NTD"—was not offered for the literal truth of the matter asserted, but rather as evidence of gang affiliation. In the photograph, defendant is shown with others in the East Side Gang, as identified by Agent Wysopal. Generally speaking, a photograph of someone is not a "statement" for hearsay purposes. See *People v Jones*, 228 Mich App 191, 204; 579 NW2d 82 (1998). While nonverbal conduct can sometimes be considered a "statement" for hearsay purposes when that conduct "is intended by the person as an assertion," MRE 801(a), the only nonverbal conduct identified by Agent Wysopal in those photographs was "handgun" symbols. (Although not mentioned by the agent, there is one person holding cash, and another person who could be making the East Side Gang symbol, though the latter is unclear.) There is nothing in the record to suggest that these symbols were intended as statements offered for the truth of some matter asserted, and neither the prosecutor nor the agent argued as such. Thus, admission of Exhibit 11B did not violate the rule against hearsay.

It is unclear whether defendant also challenges the Facebook video evidence on hearsay grounds. There is no hearsay argument offered with respect to the video in his appellate brief. Thus, the claim is abandoned. *People v Iannucci*, 314 Mich App 542, 547; 887 NW2d 817 (2016). In any event, the stream of homophobic slurs by Kinnard were not offered to prove defendant's

sexual orientation, but rather to show that defendant had a motive for attacking Kinnard or someone whom he mistook for her. The prosecutor also highlighted several comments purportedly made by defendant, but again, those comments were exempt from the definition of hearsay under MRE 801(d)(2).

### 3. GANG-RELATED EVIDENCE

Before considering the impact of the inadmissible hearsay evidence in Exhibits 11A, 11C, and 11E, we take up defendant's claim involving gang-related evidence. While defense counsel did not expressly object to the gang-related evidence based on propensity grounds, the trial court understood that this was an issue that needed to be addressed before the evidence could be admitted. Given this, the matter was preserved for appellate review, and now defendant argues on appeal that the evidence was irrelevant and unduly prejudicial.

Generally speaking, evidence is admissible if it has any tendency to make the existence of a fact that is of consequence to the action more probable or less probable than it would be without the evidence. MRE 401; MRE 402. Relevant evidence can be excluded, however, if its probative value is substantially outweighed by the danger of unfair prejudice. MRE 403. Moreover, gang-related evidence cannot be admitted to show that a person acted in conformance with gang membership. MRE 404(a); *Bynum*, 496 Mich at 630. Gang-related evidence could, however, be admissible if it used for a non-conformity purpose, such as to show "proof of motive . . . or absence of mistake or accident." MRE 404(b); see also *People v Knox*, 469 Mich 502, 509; 674 NW2d 366 (2004) (setting forth relevant factors when considering other-acts evidence).

In a murder case, proof of motive is always relevant, even if not always necessary. *Bynum*, 496 Mich at 630. Here, the prosecutor used the gang-related evidence to prove a crucial link in the chain of inference regarding motive. There was no evidence that defendant had any animosity toward Amos, nor was there any evidence that would otherwise suggest that defendant would target her. Therefore, to make sense of what otherwise appeared to be senseless, the prosecutor offered a theory of mistaken identity to the jury, and that theory critically hinged on defendant being affiliated with a gang that was a rival to the gang with which Kinnard, the intended victim, was affiliated. While there was certainly evidence of personal animosity between defendant and Kinnard based on the slurs the latter made about the former, the evidence of their respective gang affiliations reinforced the animosity between the two. The evidence also explained the context of defendant's Facebook comment, "TBF, OMW", as "OMW" is a common acronym for "on my way," but only Agent Wysopal's testimony provided the inferential link between "TBF" and "Townhouse Bloomfield Family." Finally, the gang-related evidence undermined any argument that defendant was simply in the wrong place at the wrong time, as Agent Wysopal's testimony made clear that the shooting took place in an area that would be considered enemy territory of someone affiliated with the East Side Gang. The gang-related evidence was relevant, both to motive and absence of mistake, and it went to specific attributes of this crime, rather than merely to show that defendant acted in conformance with being affiliated with a gang. Accordingly, its admission did not violate MRE 404.

Nor did its admission violate MRE 403. The four Facebook posts, including the comments and photographs, were not particularly shocking or gratuitous. The Facebook video definitely had some vile homophobic slurs, but those slurs were not obviously gang-related, and they were made

-16-

by Kinnard against defendant, not the other way around. Thus, even if a juror was offended by the language used, there is little to suggest that the juror would have held the offensive language against defendant, as opposed to drawing a negative inference against Kinnard. The evidence was prejudicial against defendant's defense, but it was not *unfairly* prejudicial, nor did it implicate any other reason for excluding evidence under MRE 403.

With respect to other-acts evidence like the gang-related evidence here, "the trial court, upon request, may provide a limiting instruction under MRE 105." *Knox*, 469 Mich at 509 (cleaned up). Defense counsel did not ask for a limiting instruction, and when asked by the trial court whether there was any objection to the instructions given to the jury, defense counsel responded, "None on behalf of the defense." "By expressly approving the jury instructions, defendant waived review of the alleged instructional error." *People v Head*, 323 Mich App 526, 537; 917 NW2d 752 (2018). "One who waives his rights under a rule may not then seek appellate review of a claimed deprivation of those rights, for his waiver has extinguished any error." *People v Carter*, 462 Mich 206, 215; 612 NW2d 144 (2000) (cleaned up). Moreover, defendant has not raised this as one of his ineffective assistance of counsel claims on appeal. Accordingly, we find no reversible error with respect to the gang-related evidence.

### 4. IMPACT OF IMPERMISSIBLE HEARSAY EVIDENCE

Turning back to Exhibits 11A, 11C, and 11E, the admission of evidence in violation of the hearsay rule does not result in an automatic reversal. Under MCL 769.26, our Legislature set out the standard that appellate courts use when considering the impact of improperly admitted evidence in a criminal trial:

> No judgment or verdict shall be set aside or reversed or a new trial be granted by any court of this state in any criminal case, on the ground of misdirection of the jury, or the improper admission or rejection of evidence, or for error as to any matter of pleading or procedure, unless in the opinion of the court, after an examination of the entire cause, it shall affirmatively appear that the error complained of has resulted in a miscarriage of justice.

For a "preserved, non-constitutional error," we consider "whether, absent the error, it is more probable than not that a different outcome would have resulted." *People v Gursky*, 486 Mich 596, 619; 786 NW2d 579 (2010) (cleaned up). The defendant has the burden "to show that the error resulted in a miscarriage of justice." *Id*. If the defendant cannot meet the burden, then the error is harmless and does not warrant reversal of the conviction. *Id*. With respect to constitutional due process, reversal based on evidentiary errors is not appropriate unless the trial was "infused . . . with unfairness." *Estelle v McGuire*, 502 US 62, 75; 112 S Ct 475; 116 L Ed 2d 385 (1991).

Exhibits 11A, 11C, and 11E were used by the prosecutor to prove that defendant went by the nickname Brick Head. Apart from this evidence, as a parole agent and expert in Saginaw-area gangs, Agent Wysopal testified that he knew defendant as Brick Head. Defendant's trial counsel did not offer any specific objection to the agent's testimony on this issue, nor does there appear to have been a valid ground for doing so. Thus, the hearsay evidence was cumulative to other evidence that was properly admitted. The three exhibits were not particularly striking or prejudicial, and while the issue of defendant's nickname was a key part in the inferential chain

linking defendant with the dispute with Kinnard, the untainted testimony of Agent Wysopal was strong, unequivocal evidence on this issue. Given the cumulative nature of the hearsay evidence, as well as all of the other evidence that placed defendant at the scene of the crime and provided him with motive for the shooting, we hold that the erroneous admission of the three exhibits was harmless. *Gursky*, 486 Mich at 620. Similarly, the admission of the hearsay evidence did not infuse the trial with unfairness, and therefore there was no deprivation of due process. *Estelle*, 502 US at 75.

## III. CONCLUSION

The increasing ubiquity of social media in our lives will require trial courts to be especially mindful of the rules of evidence when assessing whether and on what basis to admit social-media evidence. In this case, the trial court was mindful of this, and it explored several aspects of the Facebook evidence offered by the prosecutor, including authenticity, hearsay, and relevance. While we conclude that the trial court erred with respect to admitting several hearsay statements, the error was harmless. We do, however, reverse defendant's AWIM sentence and remand to the trial court to reimpose the original sentence of 40 to 50 years of imprisonment on that conviction. In all other respects, we affirm and do not retain jurisdiction.

/s/ Brock A. Swartzle
/s/ Elizabeth L. Gleicher
/s/ Michael J. Kelly